**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National University of Health Sciences, | No. CV-18-01560-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Council on Chiropractic Education Incorporated, | |
| Defendant. | |

Before the Court is an action to review the decision of the Council on Chiropractic Education Incorporated ("Council") to place the Doctor of Chiropractic Degree Program ("Program") of the National University of Health Sciences ("University") on probation for significant noncompliance with accreditation standards. (Docs. 26, 29, 31, 35, 36.)

## I. THIS LAWSUIT

On May 23, 2018, the University filed an ex parte motion for a temporary restraining order and a verified complaint for injunctive and declaratory relief seeking, among other things, an order requiring the Council to rescind its decision to place the University's Program on probation. The same day, the Court denied the ex parte motion for a temporary restraining order. On June 5, 2018, the University served the Council with a summons and the complaint; the Council filed its answer on June 26, 2018.

On July 31, 2018, the parties filed a joint case management report, which stated the parties anticipated this lawsuit would be decided on dispositive motion and "the Parties believe all information relevant to this lawsuit was previously exchanged and/or made

available during the review process that yielded the Council's findings and/or conclusions and [the University's] appeal of the same."  (Doc. 19 at 4-5.)  On August 7, 2018, a case management conference was held, and deadlines were set for merits briefing.  The parties agreed that the Court would review the Council's decision to place the University's Program on probation based on the record that was before the Council's Appeals Panel.

The merits briefing was completed on October 15, 2018.  On October 16, 2018, the Council moved for leave to file a sur-reply or, alternatively, to strike the University's reply brief because it included an exhibit that was not part of the underlying record and it referred to statutes not previously identified.  On November 15, 2018, the Court denied the Council's motion upon finding that the exhibit did not support the University's assertions and the proposed sur-reply was mostly repetition.

## II.    RELEVANT COUNCIL STANDARDS AND POLICY

The Council is a national accrediting agency recognized by the Secretary of the United States Department of Education.  The University offers a doctor of chiropractic degree program at its Illinois and Florida campuses, which has been accredited by the Council since 1971.

### A.    CCE Accreditation Standard § 2.A

CCE Standard § 2.A requires a doctor of chiropractic degree program to have a mission statement approved by the governing board and available to all stakeholders.  The program must have measurable goals and objectives congruent with the mission.  Further,

> These goals and objectives both shape the [doctor of chiropractic degree program] and guide creation of a plan that establishes programmatic priorities, and operational priorities, and program resource allocations.  The plan is structured, implemented, and reviewed in a manner that enables the [program] to assess the effectiveness of its goals and objectives, and permits the [program] to implement those changes necessary to maintain and improve program quality.

(Doc. 31-8 at 19.)

The program must be guided by both a plan and an ongoing planning process.  The planning process must include establishing program priorities, allocating resources to

- 2 -

support those priorities, and making appropriate changes to the plan based on analysis of evidence and assessment outcomes. Ongoing self-assessment must include data collection and analysis to determine the extent to which the program is achieving the goals and objectives associated with its mission. The program must demonstrate it uses data for performing assessments and for determining resource allocations and programmatic change. Institutional and program planning and resource allocations must consider measurements of curricular effectiveness.

## B. CCE Accreditation Standard § 2.H

CCE Standard § 2.H requires a doctor of chiropractic degree program to offer an educational program "commensurate with doctoral level professional training in a health science discipline, a portion of which incorporates this training into patient care settings." (Doc. 31-8 at 28.) Among other things, CCE Standard § 2.H requires a program to show:

> The didactic and clinical education components of the curriculum are structured and integrated in a manner that enables the graduate to demonstrate attainment of all required competencies necessary to function as a primary care chiropractic physician. The curriculum is consistent with the mission, goals, and objectives of the [program].

(*Id.*)

Further, the Council's accreditation standards require a doctor of chiropractic degree program to demonstrate that its students have achieved six meta-competencies, such as clinical reasoning for assessment and diagnosis, and development, implementation, and documentation of a patient care plan.

## C. CCE Policy 56

As of January 2015, the Council's Policy 56 requires a doctor of chiropractic degree program to disclose up-to-date results of student performance on national board examinations and completion rates on the program's website by August 1 each year using prescribed formats. Regarding NBCE licensing exams, a program must post the overall weighted average of the four most recent years' success rates for all four parts of the exam. In addition, for each of the four most recent years, a program must post the number of graduates who attempted any or all parts of the exam within six months after graduation

and the number and percentage of those graduates who successfully passed all parts of the exam within six months after graduation. Programs are permitted to substitute Part C of the Canadian Chiropractic Examining Board exam for Part IV of the NBCE exam.

### D. Accreditation and Noncompliance Actions

The Council grants accreditation to chiropractic educational programs "deemed by the Council to comply with the eligibility requirements and requirements for accreditation." (Doc. 31-8 at 8, CCE Standard § 1.1.) Under CCE Standard § 1.III.A, when considering accreditation status of a program, the Council may take any of the following actions at any time based on evidence: award or reaffirm accreditation, defer the decision, continue accreditation, impose warning, impose probation, deny or revoke accreditation, and withdraw accreditation.

If the Council's review of a program or institution regarding any accreditation standard and/or policy indicates that the program or institution is not in compliance, CCE Standard § 1.III.C.1 requires the Council to immediately initiate adverse action against the program or institution or require the program or institution to take appropriate action to bring itself into compliance with the accreditation standard and/or policy within a time period that must not exceed two years. CCE Standard § 1.III.C.4 provides: "Adverse accrediting action or adverse action means the denial, withdrawal, revocation, or termination of accreditation, or any comparable accrediting action the Council may take against the program or institution." Thus, probation is a sanction, not an "adverse action."

CCE Standard § 1.V provides that when the Council determines that a program or institution is not in compliance with an accreditation standard and/or policy, the Council may apply any of the following actions: warning, probation, show cause order, and denial or revocation. CCE Standard §1.V.E permits the Council to apply any of those actions "in any order, at any time, if the Council determines that [program]/institutional conditions warrant them."

CCE Standard § 1.V.B describes probation:

Probation is an action reflecting the conclusion of the Council that a program is in significant noncompliance with accreditation standards or policy requirements. Such a determination may be based on the Council's conclusion that:

1. The noncompliance compromises program integrity; for example, the number of areas of noncompliance, institutional finances, or other circumstances cause reasonable doubt on whether compliance can be achieved in the permissible timeframe; or

2. The noncompliance reflects recurrent noncompliance with one or more particular standard(s) and/or polic(ies); or

3. The noncompliance reflects an area for which notice to the public is required in order to serve the best interests of the students and prospective students.

. . . Probation is a sanction subject to appeal (see CCE Policy 8) and shall not exceed twenty-four (24) months. The Council will make public notice of a final decision to impose Probation by notifying the U.S. Department of Education, regional (institutional) accrediting agency, jurisdictional licensing boards, and the public that a program has been placed on Probation in accordance with CCE policy and procedures.

(Doc. 31-8 at 16.) Under CCE Standard § 1.V.D., reaffirmation of accreditation may be denied if the Council concludes that the program or institution "has significantly failed to comply and is not expected to achieve compliance within a reasonable time period." (*Id.*) Denial of an application for reaffirmation of accreditation constitutes revocation of accreditation.

CCE Policy 8 establishes the procedures for a doctor of chiropractic degree program to appeal adverse decisions, including public sanctions such as probation. It states:

The Program may appeal the Council's adverse action on the grounds that such a decision is arbitrary, capricious, or otherwise in substantial disregard of the CCE Standards and/or procedures of the Council, or that the decision is not supported by substantial evidence in the record upon which [the] Council took action. The burden of proof remains upon the Program at all times.

. . . .

- 5 -

> The status of an accredited Program remains unchanged until the period for filing an appeal has ended or until the appeal process has been concluded. An appeal filed in accordance with CCE appeal procedures automatically delays the adverse decision until its final disposition.

(Doc. 31-9 at 21.)  CCE Policy 8 also states, "If the Appeals Panel affirms the action of the Council, the decision of the Council becomes final and effective on the date of the Appeals Panel decision and is not subject to further appeal." (*Id.* at 26.)

Except for new information related to finances, information presented to an appeals hearing consists of only evidence presented to the Council before the adverse action. (*Id.* at 24.)  If the appeals panel affirms the action of the Council, the decision of the Council becomes final and effective on the date of the appeals panel decision. (*Id.* at 26.)  At the same time the Program is notified of the appeals panel decision, the Council must notify the U.S. Department of Education, the appropriate state regulatory authority, and the appropriate institutional accrediting agency of final Council decisions to deny initial or reaffirmation of accreditation, deny a proposed substantive change, revoke accreditation, or impose a sanction of probation or show cause order. (*Id.*)  The public is to be notified of final adverse actions in accordance with Council standards and policies. (*Id.*)

## III.  THE RECORD

On March 3, 2016, the University sent a letter to the Council, seeking reaffirmation of its accreditation by the Council.  The Council requested that the University complete a self-study by May 2017 for a site visit to be conducted in the fall of 2017.  On May 1, 2017, the University submitted its self-study to the Council.  A seven-member site team visited the University's Illinois campus on September 25-28, 2017, and its Florida campus on October 10-12, 2017.

### A.    The Final Site Team Report

On November 8, 2017, the Council transmitted to the University the Final Site Team Report.  The Final Site Team Report:

a. Found the Program to be in compliance with nine of the twelve accreditation criteria by which it evaluated the Program;

b. Identified three areas of concern;

c. Recommended for each area of concern to continue a process that had been initiated but was not fully implemented; and

d. Commended the Program on the amount of support and faculty output in the area of research and scholarly activity.

The Final Site Team Report stated, "The word **concern** identifies a conclusion of the [Council] Site Team that there is a deficiency, major to minor, in meeting the *Standards* to which the comment is connected. The site team has provided a recommendation to address the deficiency. . . . The [Program] must respond to any team concerns accompanied by recommendations." (Doc. 31-3 at 7-8.)

The first area of concern was the Program's lack of a formal programmatic plan that tied to the University's long-range plan indicating Program priorities and effectiveness as required by CCE Standard § 2.A. The site team reported that the Program's assessment plan relied too heavily on grades to evaluate student learning. Programmatic assessment was measured by NBCE passing scores, student default rates, and retention and graduation rates, but three of four years of NBCE pass rates fell below 80% as did the four-year average graduation rate. The clinical assessment instrument being used had been determined to be ineffective and was replaced in September 2017.[1] However, the replacement clinical assessment instrument had not yet generated any data at the time of the site visit and therefore could not be used to assess program effectiveness. A new curriculum evaluation process was projected to require seven years to complete. Consequently, the site team recommended that the Program "continue its maturation process in capturing assessment data that can formulate program priorities which feed into the budgeting and long-range planning of the University." (*Id.* at 10.)

---

[1] The Council's site team visited the Illinois campus in late September 2017.

The second area of concern was the Program's inability to demonstrate that all students were meeting all the outcomes of the meta-competencies as required by CCE Standard § 2.H and that the inability would continue for another two trimesters. The site team reported that in 2012 the Program adopted and implemented a model of assessment to measure the students' acquisition of mandatory meta-competencies, but the assessment data were not analyzed until 2015. The analysis revealed the assessment instrument was not used properly by some clinicians, which made the assessment scores invalid. Further, some students had been allowed to graduate without meeting the benchmark of performance established by the Program, and the assessment instrument was not designed to assess all the meta-competency outcomes. The decision to change the clinical assessment instrument was made in 2015, but it took two years to select and design a new assessment instrument. "The new clinic assessment tool . . . was in the very beginning phase of implementation at the time of the site visit." (*Id.* at 24.) The site team suggested the Program provide more training for using the new clinical assessment instrument with particular attention to the assessment rubrics and their relation to the meta-competency outcomes. The site team recommended the Program continue to implement the new clinical assessment process to ensure that all its graduates demonstrate all the meta-competency outcomes.

The third area of concern was the Program's failure to meet the 80% benchmark for the four-year overall passage rate on the NBCE licensing exam as required by CCE Policy 56. The site team noted that, before July 1, 2016, Illinois did not require students to take part IV of the NBCE exam. The percentage of students passing all four parts was below 80% for 2013, 2014, and 2015, but above 80% for 2016. Historical data showed an overall 94% pass rate for parts I, II, and III, so it was anticipated that the Program would achieve an overall pass rate above the 80% benchmark within one to two years. The site team recommended the Program continue to monitor the benchmark for compliance with the standard as more students in the Program take part IV over the next one to two years.

## B. The University's Response to the Final Site Team Report

On December 6, 2017, the University submitted to the Council its response to the Final Site Team Report. Among other things, the response provided information and explanation regarding each of the three concerns identified by the site team and requested that each of the concerns be removed.

Regarding the first area of concern, the Program's lack of a formal programmatic plan tied to the University's long-range plan (CCE Standard § 2.A), the University said that the Program's Assessment Record Overview serves as the Program's priorities document, which links to the University's long-range plan. Although the Action Plan in the Assessment Record Overview is intended to address the Program's priorities, the 2016-17 Action Plan addressed only implementation and tracking because the Assessment Record Overview was recently developed. The University said the Action Plan "accurately reflects the priorities of the [Program] to improve its data capture and assessment." (Doc. 31-4 at 14.) The first review of the Assessment Record Overview was to be completed before September 15, 2018,[2] and at that time the action steps would "be updated to reflect the needs that the [Program] Chief academic Officer will implement over the following fiscal year to improve programmatic data." (*Id.*)

Regarding the second area of concern, the Program's inability to demonstrate that all students were meeting all the outcomes of the meta-competencies (CCE Standard § 2.H), the University said it agreed with the site team that the University should "continue to engage in the maturation process consistent with [the Council's] enduring purpose of encouraging ongoing improvement." (*Id.* at 29.) The University asserted that the clinical assessment instrument used before the fall of 2017 plus licensure examination results demonstrates achievement of the seven meta-competencies. However, the University acknowledged "its challenges" with the older clinical assessment instrument and said it had already implemented a new one. (*Id.* at 30.) At the site team's suggestion, the University also had conducted additional training regarding the new instrument. At the

---

[2] The Council's site team visited the Illinois campus in late September 2017.

time of its response in December 2017, a pilot project was being finalized to validate and implement the new clinical assessment instrument.

Regarding the third area of concern, the Program's failure to meet the 80% benchmark for percentage of students passing all four parts of the NBCE licensing exam for the previous four years, the University stated, "The lack of NBCE Part IV being required for Illinois licensure previously resulted, for many years, in students not taking the Part IV examination, putting [the University] at a distinct disadvantage for meeting the Policy 56 benchmark."  (*Id.* at 34.)  Since 2013, 87% of the University's students who took the Part IV exam passed.  The University said that its "2016 Policy 56 data as well as its historical 87% passing rate on NBCE Part IV [] are strong indicators that [the University] will meet the Policy 56 benchmark when students considering licensure in Illinois participate in the NBCE Part IV."

### C.  Status Review Meeting

On January 13, 2018, the Council met with representatives of the University in a status review meeting to consider the application for reaffirmation of the Program's accreditation and to discuss outcomes and progress made since the site visits.  In addition to reviewing all materials related to the accreditation process, "the Council conducted the status review meeting to provide an opportunity for [University] representatives to answer questions posed by the Council."  (Doc. 31-5 at 2.)  During the meeting, the Council discussed multiple items, including the three issues it had previously initiated as areas of concern.

### D.  The Council's Reaffirmation Letter

On February 2, 2018, the Council issued its Reaffirmation Letter, which stated that after the status review meeting the Council conducted deliberations and reached a consensus decision to reaffirm the accreditation of the Program.  It further stated that reaffirmation began the next eight-year accreditation cycle for the Program.

For each of the previously identified areas of concern, the Reaffirmation Letter summarized the site team's findings, acknowledged additional information provided by the

University, explained the Council's determination of noncompliance, and explained specifically what the University must do to demonstrate compliance. The Reaffirmation Letter requested a progress report by August 1, 2018, in preparation for a focused site visit to each campus in the fall of 2018 and for review by the Council at its January 2019 meeting. The Reaffirmation Letter stated:

> The Council has concluded that the [Program] is in significant noncompliance with accreditation standards or policy requirements and determined the noncompliance compromises program integrity and hereby **imposes a sanction of Probation** upon [the University]. Probation is a sanction, subject to appeal and shall not exceed twenty-four (24) months. The Council will make public notice of a final decision to impose Probation in accordance with [Council] policy and procedures. . . .

> As indicated above, and in accordance with CCE Policy 8, *Appeals of Decisions by the Council*, the Program may appeal the Council's adverse action on grounds that such decision is arbitrary, capricious, or otherwise in substantial disregard of the CCE Standards and/or procedures of the Council, or that the decision is not supported by substantial evidence in the record upon which [the] Council took action. The burden of proof remains upon the Program at all times. A copy of CCE Policy 8 and the CCE Accreditation Standards are enclosed for your information.

> As stated in CCE Policy 8, "The status of an accredited Program remains unchanged until the period for filing an appeal has ended or until the appeal process has been concluded. An appeal filed in accordance with CCE appeal procedures automatically delays the adverse action until its final disposition."

(Doc. 31-5 at 4.) The Reaffirmation Letter also explained that at the time the Council notifies a program or institution of a final decision to place it on probation, it will provide written notice to the U.S. Department of Education, all state licensing boards, and the appropriate accrediting agencies. Within 24 hours of its notice to the program or institution, the Council will provide written notice to the public of its final decision.

Regarding the first area of concern (the Program's lack of data to evaluate program effectiveness), the Reaffirmation Letter stated that while the Program had developed an assessment plan with several assessment reports and processes, the Program "does not currently collect and review program-level data to evaluate the [Program] since several of

these multi-year processes are still in pre-data collection phases." (*Id.* at 3.) It acknowledged the Program's response regarding its plan to collect and analyze program via a newly administered system. The Reaffirmation Letter requested that the Program demonstrate "(1) further evidence of implementation of its program effectiveness plan and associated measures, including the collection and analysis of program-level meta-competency assessment data; and (2) evidence that the analysis is tied to budgeting and planning processes, and utilized to inform program improvements." (*Id.*)

Regarding the second area of concern (the Program's inadequate assessment of the meta-competencies), the Reaffirmation Letter acknowledged the Program's response regarding the recent implementation and enhanced tracking of the new clinical assessment instrument and the Program's current efforts to ensure that meta-competency components are taught in the curriculum. However, the Council agreed with the site team that the Program was unable to evidence the achievement of all meta-competency outcomes for each student by graduation. The Council also noted that the curriculum map provided by the Program mapped the meta-competency outcomes instead of the meta-competency components to the Program's courses. The Reaffirmation Letter requested that the Program provide "(1) evidence that <u>all</u> students achieve each of the meta-competency outcomes prior to graduation, and (2) evidence that the meta-competency *components* are covered in the [Program] curriculum." (*Id.*)

Regarding the third area of concern (noncompliance with CCE Policy 56), the Reaffirmation Letter acknowledged the University's response to the site team report regarding NBCE success rates and the 2016 Part IV requirement by the Illinois chiropractic licensing board. The Reaffirmation Letter stated that in accordance with CCE Policy 56, the Program's success rate is 76%, which is below the established threshold of 80%. The Reaffirmation Letter requested that the Program "provide detailed plans and actions to achieve compliance with the CCE Policy 56 NBCE student performance threshold within a two-year interval." (*Id.*)

**E.** **Appeal of Probation Sanction**

On February 23, 2018, the University appealed the Council's sanction of probation. On April 30, 2018, the University served its written grounds for appeal, which contended:

a.  The Council's action to place the Program on Probation after reaffirming its accreditation status failed to comply with the Council's Standards and was arbitrary and capricious.

b.  The Council's action to place the Program on Probation deprived the University's right to due process as set forth in 34 C.F.R. § 602.25.

c.  The Council's decision that the Program was not in compliance with CCE Policy 56 was arbitrary and capricious because CCE Policy 56 violates 34 C.F.R. § 602.16(a)(1)(i) and conflicts with Illinois public policy, it was unreasonable for the Council to require the University to report misleading NBCE exam success rates, and the decision was discriminatory.

d.  The Council's action to place the Program on Probation deprived the University's right to due process because the decision arose from the Council's arbitrary and capricious decision that the Program was not in compliance with CCE Policy 56.

e.  The Council's action to place the Program on Probation should be reversed because its sanction had the effect of substantially and materially hindering the University's ability to correct the areas of concern within the permissible timeframes set forth in CCE Standard §1(V).

On May 11, 2018, an appeal hearing was held in which the University was represented by five administrators and two attorneys. The appeals panel chair began the hearing by stating, "The sole issue for the appeal panel's review is CCE's decision to place NUHS on probation for failure to demonstrate compliance with CCE's Standards Section 2-A and 2-H and CCE policy 56." (Doc. 31-6 at 5.) The chair identified three determinations the panel would make: (1) whether each concern or area of noncompliance was supported by substantial evidence; (2) whether those supported by substantial evidence are sufficient to support the adverse action of the Council; and (3) whether the procedure used to reach the adverse action were contrary to Council procedures, policies, or practices and whether any procedural error prejudiced the Council's consideration. Then, the chair said, the panel would report detailed findings and issue a decision to affirm, amend,

reverse, or remand the adverse action of the Council. One of the University's attorneys made a 45-minute presentation, which was followed by a response from the President and CEO of the Council. Each side made a closing statement during which panel members asked a few questions. Among other things, counsel for the University stated that it did not appeal the findings of the site team. (*Id.* at 22.)

### F. Appeals Panel Report

On May 21, 2018, the Council issued its Appeals Panel Report affirming the Council's decision to place the Program on probation. The appeals panel determined that each of the three concerns reported by the site team was supported by substantial evidence and the Program failed to provide evidence that demonstrated compliance with CCE Standards §§ 2.A and 2.H and Policy 56. The appeals panel found that the severity of noncompliance was sufficient to support the imposition of probation by the Council. The appeals panel further found that the combination of the three areas of noncompliance support the determination that the Program was in significant noncompliance with accreditation standards or policy requirements and that this level of noncompliance compromised program integrity.

The appeals panel found no evidence that the procedures, policies, or practices followed during the reaffirmation process were contrary to established Council procedures, policies, or practices. Evidence that Council procedures, policies, and practices were followed included reviews in 2013 and 2016 by the U.S. Department of Education and an example where the Council previously imposed probation under similar circumstances and received U.S. Department of Education recognition.

The Appeals Panel Report dated May 21, 2018, concluded:

The decision of the appeals panel is to **Affirm** the decision of The Council on Chiropractic Education as stated in the February 2, 2018 Council letter to [the University]. The evidence demonstrates that [the Council] followed its policies and procedures and [the University] did not provide evidence of compliance with cited standards and policies.

(Doc. 28-1 at 10.)

**IV.  ANALYSIS**

The University contends:  (1) the Council deprived the University of due process by failing to provide opportunity to submit written opposition and hearing before placing the Program on probation, (2) the Council acted arbitrarily and capriciously by simultaneously reaffirming the Program's accreditation and placing it on probation for "significant noncompliance" with the Council's accreditation standards, and (3) the Council acted arbitrarily and capriciously by concluding that the University's students were not meeting the Council's board passage rate by applying a calculation that had a disparate impact on the University.  The University requests that the Court (a) declare that the Council violated the University's due process rights in the accreditation reaffirmation process, (b) vacate the Council's action of placing the Program on probation, and (c) set this matter for hearing on compensatory damages.

**A.  Legal Standard**

"Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary for the purpose of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court."  20 U.S.C.A. § 1099b(f).

Federal law requires higher education accrediting agencies and associations to consistently apply and enforce their standards.  20 U.S.C. § 1099b(a)(4)(A).  An accrediting agency or association must establish and apply review procedures throughout the accrediting process that comply with due process procedures that provide for adequate written specification of "requirements, including clear standards for an institution of higher education or program to be accredited; and identified deficiencies at the institution or program examined."  20 U.S.C. § 1099b(a)(6)(A).  The due process procedures also must provide "for sufficient opportunity for a written response, by an institution or program, regarding any deficiencies identified by the agency or association to be considered by the

agency or association . . . prior to final action in the evaluation and withdrawal proceedings." 20 U.S.C. § 1099b(a)(6)(B). Upon written request, the accrediting agency or association must provide opportunity for the institution or program to appeal any adverse action, "including denial, withdrawal, suspension, or termination of accreditation," before the adverse action becomes final. 20 U.S.C. § 1099b(a)(6)(C). "Adverse accrediting action or adverse action means the denial, withdrawal, suspension, revocation, or termination of accreditation or preaccreditation, or any comparable accrediting action an agency may take against an institution or program." 34 C.F.R. § 602.3. Neither party has argued that placement on probation is comparable to denial, withdrawal, suspension, revocation, or termination of accreditation or preaccreditation.

Under 34 C.F.R. § 602.25, an accrediting agency must demonstrate that the procedures it uses throughout the accrediting process satisfy due process. An agency meets this requirement if it does certain things, which include providing written specification of deficiencies identified at the institution or program being examined, providing sufficient opportunity for a written response by an institution or program before any adverse action is taken, notifying the institution or program in writing of "any adverse accrediting action or an action to place the institution or program on probation or show cause" and the basis for the action, and providing opportunity for the institution or program to appeal any adverse action before the action becomes final. 34 C.F.R. § 602.25. The regulation refers to placement on probation as distinct from an adverse action in the context of providing written notification. It does not expressly include placement on probation with respect to other due process requirements.

To demonstrate that its standards for accreditation are sufficiently rigorous, an agency's accreditation standards must effectively address the quality of the institution or program in certain areas, including "[s]uccess with respect to student achievement in relation to the institution's mission, which may include different standards for different institutions or programs, as established by the institution, including, as appropriate,

consideration of State licensing examinations, course completion, and job placement rates." 34 C.F.R. § 602.16(a)(1).

Although there is no express private right of action available to enforce the Higher Education Act, which governs the accreditation of institutions of higher education, there exists a common law duty on the part of quasi-public private accreditation agencies to employ fair procedures when making decisions that affect their members. *Prof'l Massage Training Ctr., Inc. v. Accreditation Alliance of Career Sch. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015). When reviewing common law due process claims against accreditation agencies, courts should focus primarily on whether the agency's internal rules provide a fair and impartial procedure and whether the agency followed its rules in reaching its decision. *Id.* at 172. Courts have afforded accreditation decisions great deference and have limited their review to whether the decisions were arbitrary and unreasonable and whether they were supported by substantial evidence. *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 528 (6th Cir. 2001).

## B. Notice and Opportunity to Challenge Sanction of Probation

The University contends that the Council deprived the University of due process by failing to provide opportunity to submit written opposition and hearing before placing the Program on probation. The University does not dispute that it had opportunity to respond to the Final Site Team Report both in writing and in person. But, it contends, the site team did not recommend probation and did not have authority to recommend or impose probation. Thus, the University did not have opportunity to challenge the appropriateness of the sanction of probation before the Council issued the Reaffirmation Letter on February 2, 2018.[3]

The University's argument relies on the incorrect assumption that the Program was sanctioned at the time the Council issued the Reaffirmation Letter. (*See* Doc. 26 at 8: "Here, the Council deprived [the University] of those fundamental rights by delivering

---

[3] But the University was not precluded from advocating against the imposition of any sanction or adverse action in its response to the Final Site Team Report and subsequent status review meeting.

indictment, conviction, and sentence in a single order, its February 2, 2018 Reaffirmation Letter.")  Although the Reaffirmation Letter said it "hereby imposes a sanction of Probation," it also said, quoting CCE Policy 8, "The status of an accredited Program remains unchanged until the period for filing an appeal has ended or until the appeal process has been concluded."  (Doc. 31-5 at 4.)  CCE Policy 8 also states, "If the Appeals Panel affirms the action of the Council, the decision of the Council becomes final and effective on the date of the Appeals Panel decision and is not subject to further appeal." (Doc. 31-9 at 26.)

Further, the Reaffirmation Letter said that the Council would make public notice of a *final* decision to impose probation and that an appeal automatically delays the adverse action until its final disposition.  (Doc. 31-5 at 4.)  Thus, the sanction of probation was not effective until the appeal process was concluded.  There is no dispute that the University had notice and opportunity to challenge the sanction of probation in writing and during the appeal hearing before the sanction became final.

### C.    Simultaneous Reaffirmation of Accreditation and Probation Sanction

The University contends that the Council acted arbitrarily and capriciously by simultaneously reaffirming the Program's accreditation and placing it on probation for "significant noncompliance" with the Council's accreditation standards.  The Reaffirmation Letter stated that the Council had decided to reaffirm accreditation of the Program.  Under CCE Standard § 1.1, the Council grants accreditation to programs "deemed by the Council to comply with the eligibility requirements and requirements for accreditation."  (Doc. 31-8 at 8.)  The Reaffirmation Letter also imposed a sanction of probation because the Council had concluded the Program was "in significant noncompliance with accreditation standards or policy requirements."  (Doc. 31-5 at 4.) The University contends the Council cannot find the Program complied with accreditation requirements and did not comply with accreditation standards or policy requirements. However, reaffirming accreditation with probationary conditions is permitted under the Council's standards and is neither arbitrary nor capricious in the present context.

Under CCE Standard § 1.III.C.1, if the Council finds that a program is not in compliance with an accreditation standard or policy, the Council must either initiate an adverse action or require the program to take appropriate action to bring itself into compliance. Under CCE Standard § 1.V, if the Council finds that a program is not in compliance with an accreditation standard or policy, the Council may apply any of a number of actions, including probation, in any order, at any time. Under CCE Standard § 1.V.B, the Council may apply probation if it concludes that a program is in "significant noncompliance," based on the Council's conclusion that the number of areas of noncompliance or other circumstances cause reasonable doubt regarding whether compliance can be achieved in the permissible timeframe. Under CCE Standard § 1.V.D., reaffirmation of accreditation may be denied if the Council concludes that the program or institution has "significantly failed to comply" and is not expected to achieve compliance within a reasonable time period. Thus, based on its conclusion that the Program was in "significant noncompliance," the Council was permitted to revoke accreditation or to reaffirm accreditation with probation.

Probation is consistent with the Council's conclusion that the Program had not yet demonstrated compliance in three areas of concern but had begun to take appropriate action to bring itself into compliance. Further, circumstances indicated compliance likely would not be achieved in less than two years. Regarding the first area of concern (the Program's lack of data to evaluate program effectiveness), the Council found that the Program's assessment plan was still under development and would require multiple years to produce program evaluation data. The Council requested that the Program demonstrate further evidence of implementation, including analysis of how the results were being used for program improvement. Regarding the second area of concern (the Program's inadequate assessment of meta-competencies), the Council found that the Program had recently begun implementation of a new clinical assessment instrument and efforts to ensure that meta-competency components are taught in the curriculum, but further work was needed on both. Regarding the third area of concern (noncompliance with CCE Policy 56), the source of

the problem (*i.e.*, Illinois state licensing did not require students to take Part IV of the NBCE exam) was diminishing each year since 2016 when Illinois state licensing began requiring students to take Part IV of the NBCE exam. By the end of the probationary period, the Program would be able to report the overall weighted average of the four most recent years' success rates for all four parts of the exam without concern that many of its students were not taking Part IV.

Therefore, the Council was permitted to grant reaccreditation while requiring the Program to take appropriate actions to bring itself into compliance. It was also permitted to place the Program on probation based on circumstances that cause reasonable doubt regarding whether compliance could be achieved within two years. The Council did not act arbitrarily and capriciously by simultaneously granting reaccreditation and imposing probation.

### D.    Board Passage Rate

The University contends that the Council acted arbitrarily and capriciously by concluding that the University's students were not meeting the Council's board passage rate by applying a calculation that had a disparate impact on the University. In January 2015, CCE Policy 56 began requiring programs to disclose the number of students who attempted any or all parts of the NBCE exam and the number and percentage of students who passed all four parts of the exam. Before July 1, 2016, the State of Illinois did not require license applicants to take Part IV of the exam, and therefore many of the Program's graduates did not take it. As a result, the Program's passage rate for all four parts of the exam was lower than its passage rate for only the first three parts. It was also lower than its passage rate when calculated as a percentage of students who had taken all four parts of the exam. Programs located in other states likely had fewer students seeking Illinois licensure and likely had a greater percentage of students who took all four parts of the exam.

First, the University asserts that CCE Policy 56 conflicted with Illinois public policy before July 1, 2016, because it ignored Illinois's unique licensing requirement. If it ignored

anything, it ignored Illinois's omission of a licensing requirement. The fact that Illinois previously did not require passage of Part IV of the NBCE exam for licensure does not necessarily mean that the Illinois licensing authority disapproved of Part IV of the exam or that requiring graduates to take Part IV of the NBCE exam conflicted with Illinois public policy. Further, the fact that Illinois now requires passage of Part IV for licensure implies it does not conflict with Illinois public policy.

Second, the University asserts that CCE Policy 56 requires the University to report distorted and misleading NBCE exam passage rates. The University contends that the stated purpose of CCE Policy 56 is to provide prospective students information regarding a program's ability to prepare its students for the NBCE exam and by reporting the results of all four parts instead of only three parts, prospective students will be misled. In fact, prospective students comparing passage rates for different schools might be misled if the University does not publish results using the same format as other schools. The University does not contend that CCE Policy 56 prevented it from providing prospective students with additional information such as Part IV passage rates using only students who attempted that part or passage rates for only Parts I, II, and III.

Third, the University asserts that the Council applies CCE Policy 56 in an inconsistent manner and has a discriminatory impact because it permits programs to use the Canadian Chiropractic Examining Board Part C exam data in lieu of NBCE Part IV data. CCE Policy 56 does not discriminate among programs. It permits all programs, including the University's Program, to substitute Canadian Chiropractic Examining Board Part C exam data for NBCE Part IV data if any of its graduates take the Canadian Chiropractic Examining Board Part C exam. The University did not propose substituting an alternative exam for its graduates who sought Illinois licensure or contend that Part IV of the NBCE exam does not provide an important assessment of program effectiveness.

Thus, the Council did not act arbitrarily and capriciously by concluding that the University's students were not meeting the Council's board passage rate based on all parts of the NBCE exam. In addition, whether noncompliance with CCE Standards §§ 2.1 and

2.H alone would be sufficient to support imposition of probation is moot because the Court has found that the Council did not deprive the University of due process by its application of CCE Policy 56.

IT IS THEREFORE ORDERED that the Clerk of the Court enter judgment against Plaintiff in favor of Defendant and that Plaintiff take nothing on its complaint.

The Clerk shall terminate this case.

Dated this 31st day of January, 2019.

_____
Neil V. Wake
Senior United States District Judge